UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES

       -against-                           23 CR 506 (GHW)

NERIK ILYAYEV
-------------------------------------------------------x


**NERIK ILYAYEV'S
SENTENCING MEMORANDUM**


Deborah Colson
Christopher Neff
Moskowitz Colson Ginsberg & Schulman LLP
80 Broad Street, Suite 1900
New York, N.Y. 10004

David M. Eskew
Abell Eskew Landau LLP
256 5th Ave, 5th Floor
New York, N.Y. 10001

*Attorneys for Nerik Ilyayev*

## I.

## INTRODUCTION

At his core, Nerik Ilyayev is a provider. As the youngest son, he is the primary caretaker for his elderly and infirm parents. As the husband in a traditional Jewish household, he is the sole breadwinner for his wife and children. And as a first-generation immigrant who spent his childhood in the oppressive environment of the Soviet Union, he proudly supports newly arrived members of his community, assisting their integration into the United States. His criminal conduct was a shameful digression from a life of quiet service to family and community. It will not be repeated.

Mr. Ilyayev recognizes the seriousness of his offense and understands that he must be punished, but the Probation Department's sentencing recommendation of 40 months is significantly greater than necessary to achieve the goals of sentencing. Mr. Ilyayev has no prior criminal record, his family depends on his financial and emotional support, and he is a force for good in the Bukharan Jewish community where he attends synagogue regularly and meets with teenagers to tell his story and illustrate by example the dangers of engaging in "get-rich-quick" schemes like the instant offense. As a demonstration of his contrition and commitment to making amends, Mr. Ilyayev is prepared to sell his properties in order to meet his financial obligations in this case. He has provided prosecutors with a financial affidavit and detailed outline of his plan.

Dozens of Mr. Ilyayev's relatives and friends have written to the Court describing his devotion to family, generosity with friends, and humility before his community. The enormous outpouring of support for Mr. Ilyayev is a testament to his character. "He is not a man of many words," writes his friend Radmila Shimanova, "but he is man of very many good deeds." Ex. A. Or as Elisheva Rubinova explains, "[h]e truly embodies the proverb teachings of 'say little and do a lot.'" Ex. B.

For the reasons described below, we ask the Court to impose a sentence significantly below Probation's recommendation.

## II.

## MR. ILYAYEV'S PERSONAL HISTORY AND CHARACTERISTICS

A. <u>Mr. Ilyayev's Childhood</u>

Mr. Ilyayev and his family are Bukharan Jews, from a religious tradition founded in Bukhara, Uzbekistan at least two thousand years ago. He was born in 1987 in Samarkand, an ancient city on the Silk Road in what was then the Uzbek Soviet Socialist Republic. PSR ¶ 79. The standard of living in the Uzbek SSR was shockingly poor. Mr. Ilyayev's parents' first child died of an infection in 1983 at the age of eleven months after a hernia repair surgery. *Id.* at ¶ 80. The infection easily would have been prevented in the West, but it proved fatal in the Uzbek SSR where antibiotics were not readily available.

The Soviet Union collapsed in 1991 when Mr. Ilyayev was four, leading to turmoil in the Uzbek Jewish community. Many Jewish families feared that independence would mean a resurgence of violence and oppression by Muslim nationalists. Mr. Ilyayev's family was among thousands of families who fled the region in the early 1990s. They resettled in Moscow where his father, Masanel worked as a professional chef. PSR ¶ 81.

Upon their arrival in Moscow, Mr. Ilyayev's family lived in a cramped one-bedroom apartment in a badly impoverished neighborhood plagued by alcohol, drugs, and violence. PSR ¶ 81. They were later joined by his older half-brother, Ilya who was the product of an affair his father had carried out when his parents were briefly separated. Mr. Ilyayev's mother, Rivka had been a hematologist in the Uzbek SSR but was unable to work in Russia, so the family was forced

to survive on his father's earnings as a chef. Stressed by financial hardship and the aftermath of his father's infidelity, Mr. Ilyayev's parents fought frequently.

Mr. Ilyayev and his brothers attended a Jewish school an hour outside of Moscow by train. Their parents taught them to hide their Jewish faith, but they stood out as recognizably foreign among the typically blond and pale-skinned Russians and were sometimes targeted as a result. Mr. Ilyayev remembers seeing antisemitic slang scrawled in graffiti on the train, including "Death to Jews" and other racially derogatory remarks.

In 1998, when Mr. Ilyayev was 11, he and his brothers were violently assaulted by a gang of Russian skinheads while waiting for the train home. PSR ¶ 82. Upon sighting the Ilyayev brothers, the skinheads surrounded the boys and beat them badly. Ilya was particularly badly injured, but Mr. Ilyayev and his older brother Boris were also beaten and threatened with a knife. After the boys returned home bruised and bloody, their mother became determined to get her children out of Moscow and began making plans to emigrate to the United States. *Id.*

Three years later, she and the children relocated to Rego Park, Queens where they moved into a one-bedroom apartment, which they shared with a cousin. They were granted humanitarian parole into the United States based on the religious persecution they had experienced in Moscow. PSR ¶ 82. However, because the terms of their entry forbade them from obtaining any kind of public support or benefits, they had no choice but to rely on the kindness of neighbors and other Bukharan Jews for food, clothing, and basic provisions. *Id.* at ¶ 83.

Less than a year after their arrival, both of Mr. Ilyayev's maternal uncles in Uzbekistan died suddenly. One of the brothers was found dead, and the circumstances of his death remain unknown. Lacking any family in New York, Mr. Ilyayev's mother mourned the loss of her brothers alone and fell into a debilitating depression. Just several months later, she was diagnosed with

breast cancer, *see* PSR at ¶ 79, although she initially hid that diagnosis from her children. She had been granted a work permit when the family arrived in the United States, but her health made it difficult to work—and the fact that she spoke no English made it impossible to obtain a living wage. A hematologist by training, she was forced to take a series of part-time, low wage jobs.

With their mother unable to obtain meaningful employment and their father still in Moscow, Mr. Ilyayev and his brothers had to find jobs of their own to support the family. Mr. Ilyayev got his first job at age 14, sweeping and mopping floors at a Russian supermarket. PSR ¶¶ 83, 109. He has worked ever since, often balancing two jobs at once.

Mr. Ilyayev's father joined his family in Queens in 2002. PSR ¶ 82. He did not want to emigrate and did so only because of his wife's cancer diagnosis. Life in New York was not what he had hoped for or had been led to expect. Friends and relatives had told him that the United States was a place of opportunity, but he found it unfriendly and emotionally trying. Unable to speak or understand English, he became depressed, isolated, and reclusive. Most days, he refused to leave the apartment. To make matters worse, less than two years after his arrival, he suffered a series of strokes that left him partially paralyzed. *Id.* at ¶ 79. From then on, he spent all of his time indoors, watching Russian-language TV.

Mr. Ilyayev learned of his mother's cancer diagnosis when his father emigrated. He did not know what the word "cancer" meant, so he went to a Russian-speaking pharmacy and asked the pharmacist if people with cancer are able to survive. The pharmacist told him that cancer is usually fatal and that his mother would surely die. Mr. Ilyayev was devastated, believing he could lose his mother at any moment. In the months that followed, she underwent surgery, chemotherapy, and many rounds of radiation treatment. Eventually, her cancer entered remission and she was able to return to school to become a substance abuse counselor, a job she held for several years. Even

while his mother worked, however, Mr. Ilyayev remained the main breadwinner of the household, working at the supermarket and later at a jewelry store for a minimum hourly wage. PSR ¶¶ 108-09.

B.  Mr. Ilyayev's Education and Employment History

In the Bukharan Jewish tradition, the youngest son is expected to care for his parents, setting aside his own goals to do so if necessary. Mr. Ilyayev, who has always believed that his father is an amazing parent despite his shortcomings, blamed himself for his father's disappointment and for the family's financial and emotional difficulties. He felt pressured to succeed and to create a good life for his parents. "Nerik's family was very traditional," explains his friend Gary Kaziyev. Ex. C. "[H]e had traditional values instilled in him. He was expected to go to school, work hard, help his parents provide, and marry and start a family young, so there was a lot of pressure to become financially stable at a young age." *Id*.

Mr. Ilyayev worked hard to fulfill his parents' expectations and to adapt to changing circumstances along the way. After graduating from Forest Hills High School in 2004, he enrolled in an associate's program at York College, where he hoped to secure placement in the dentistry school. PSR ¶¶ 100-101. Unfortunately, he had to withdraw after several semesters because it was too difficult for him to manage a full courseload of classes while working at the jewelry store. *Id*. at ¶ 100. Several months later, while accompanying his father to Moscow on what was intended to be a short vacation, his father fell ill and was unexpectedly hospitalized. Mr. Ilyayev stayed with his father for three weeks while he recovered and was fired from the jewelry store upon his return.

Now unemployed with his dream of a college education on hold, Mr. Ilyayev changed his focus and applied for cosmetology school, believing that a career as a hairstylist would provide financial stability while enabling him to pursue his education. PSR ¶ 103. After graduating from

cosmetology school, he worked for several years at the Butterfly Studio Salon in Manhattan and attended the Moscow Institute of Entrepreneurship and Law online. *Id.* at ¶¶ 99, 107. Ultimately, however, he was not able to earn sufficient income to justify his continued employment at the salon. According to Mr. Kaziyev, who also attended cosmetology school, "[t]he hours were long, and without a stable clientele there wasn't always steady income." Ex C.

In 2012, Mr. Ilyayev changed course again, leaving the salon to continue his education online. In 2014, having earned a bachelor's degree in finance, he opened a consulting business and began pursuing a career in law. PSR ¶¶ 99, 106. He earned a master's degree in law at the Moscow Institute of Entrepreneurship and Law in 2022. *Id.* at ¶ 99. Last year, he fulfilled his dream of starting law school in the U.S. when he was admitted to St. John's University, where he expects to earn his *juris doctor* in December 2024. *Id.* at ¶ 98.

C. Mr. Ilyayev's Family



Those closest to Mr. Ilyayev know that family is his priority. Mr. Ilyayev met his wife Margarita Fayzakova in 2015 through a family friend, and they married the following year. PSR ¶ 84. Two months after their wedding, while they were on their honeymoon, Mr. Ilyayev received an emergency telephone call from his mother, who told him that his father had fallen ill and was refusing treatment in his son's absence. The couple cancelled the remainder of their vacation and flew back to New York. Hours after their return, Mr. Ilyayev's father was admitted to the hospital for emergency surgery to remove a blood clot in his intestine. He was released after four weeks in the intensive care unit but returned to another hospital the following day to be treated for an infection. Mr. Ilyayev remained at his father's side throughout this period, leaving the hospital only to eat or shower.

Mr. Ilyayev's first child, ███, was born in 2017. PSR ¶ 84. A second daughter, ███, followed the next year. *Id.* During Margarita's pregnancy with ███, she and Mr. Ilyayev learned

that their daughter would have a cleft lip. *Id.* at ¶ 85. Others in their community pressured them to choose abortion, arguing that their daughter would "never be pretty," but they rejected that suggestion. ███ had her first corrective surgery when she was just three months old. Margarita writes that "[t]he idea of my infant needing surgery so soon after birth wrecked me." Ex. D. "I had a 10-month-old to take care of, but I was completely preoccupied with worry and fear about the upcoming and uncertain fate of my growing baby. It was during this time, the dark time between the diagnosis and the surgery, that Nerik stepped in and was my anchor. He consistently validated my feelings yet assured me that our baby is perfect, that everything will be fine." *Id.*

A few years after ███ was born, Margarita gave birth to their third child, ███. PSR ¶ 84. ███ was born with craniosynostosis, a condition in which an infant's skull fuses prematurely, preventing the skull from growing and expanding along with the child's growing brain. *Id.* at ¶ 85. He had emergency surgery when he was six weeks old, then underwent "helmet therapy" until his first birthday, a process by which he was fitted with custom helmets every two weeks, designed to protect his brain while ensuring that the shape of his skull developed normally. *Id.* Mr. Ilyayev accompanied Margarita to every helmet appointment and helped to care for the older children while she tended to Asher. Ex. D. "Nerik has made every step of our difficult journey bearable," remarks Margarita, "and I cannot imagine how I would have survived without him." *Id.*

The couple is expecting their fourth child this May, a month after the date set for Mr. Ilyayev's sentencing in this case. PSR ¶ 84.

Mr. Ilyayev's friends Arthur and Zina Iskhakov describe him as "an amazing son, brother, husband, and most importantly an amazing father … a very involved parent and an amazing role model to his children." Ex. E. Another friend, Ruben Fayzakov writes that Mr. Ilyayev is "the epitome of a hands-on father, [who] is always attending his children's school and sporting events,

supporting their extracurricular activities, and [who] plays an active role in their physical and emotional development." Ex. F. "He actively participates in the upbringing of his children," adds his sister-in-law Doris Shamuilova. Ex. G. "When we would come over for dinners or play-dates with the kids, Nerik was always present and interactive. He would laugh and play with the kids, constructing entertaining games for everyone to enjoy, all in the comfort of their living room." *Id.*

Mr. Ilyayev is not just responsible for his wife and children. He is also the primary caretaker for his parents who live in the apartment downstairs from him and Margarita. Both parents are seriously ill and debilitated. PSR ¶ 79. His mother was in remission for several years after she had chemotherapy, but her cancer returned in 2021, and she underwent a bilateral mastectomy. She also suffers from Type II diabetes, high blood pressure, a heart condition, and vertigo. *Id.* Her heart condition has worsened since her son's arrest, and she is now unable to walk more than a few steps without experiencing shortness of breath. *Id.* Mr. Ilyayev's father is also disabled. He suffers from Type I diabetes, atrial fibrillation, high cholesterol, and chronic bronchitis, and he is actively recovering from a broken hip. *Id.* Mr. Ilyayev takes his parents to doctors' appointments, fills their prescriptions, and cooks their meals. Ex. H. He is responsible for making their health care decisions and for acting as a translator with their doctors. *Id.* He also works the overnight shift through United Home Care as his mother's home health attendant. PSR ¶ 104.

Mr. Ilyayev "has always lived close to his parents," explains his friend Diana Badalova, "and after his mother's cancer diagnosis, he moved in with them to provide support and care." Ex. I. "He is a loving and devoted son, an indispensable pillar for his family. The reality is that his parents rely on him for medical appointments and their overall well-being." *Id.* "Everyone on a daily basis bears witness to how Mr. Ilyayev cares for his elderly parents," adds Elisheva Rubinova.

Ex. B. "No hesitations, no questions, just gets it all done quietly, respectively [sic], and humbly." *Id.*

"It is vital for the court to understand the fragile state of our family," writes Ilya. Ex. J. "Our father is 82, and our mother is 77 [now 78]. Our father's health took a significant turn for the worse a month ago when he fell and broke his hip, requiring immediate surgery. As a result, he is heavily reliant on assistance for even the most basic activities. Nerik Ilyayev has been a pillar of support during this challenging time, offering both emotional and physical assistance to our father during his recovery." *Id.* Ilya has tried to take over their father's medical care because he knows that Mr. Ilyayev has his own family to support, but their father consistently refuses Ilya's assistance. "[E]ven going to simple doctor's appointments, he feels more comfortable going with Nerik because he knows that he will find him the best doctor…when Nerik is there he is in good hands." Ex. K.

    D.  <u>Mr. Ilyayev's Work in the Community</u>

Mr. Ilyayev shows the same thoughtfulness to his community as he does to his family. He is active in his synagogue, maintains dozens of friendships, many of which began in childhood, and gives generously to charity. His friend Kathy Suleymanov describes him as "a person who does not have the word 'no' in his vocabulary. He will go above and beyond—he will move mountains and go out of his way to help absolutely anyone in any type of need … Whether it's through charity and donations and helping in the community and helping to do service, his answer is always 'yes.'" Ex. L.

Mr. Ilyayev's sister-in-law, Doris Shamuilova remembers when the school associated with their synagogue suffered "massive damage" after a flood. Ex. G. She writes that "Nerik made it a priority to show up and give his time and help clean up to expedite the rebuilding of the facility."

*Id.* "His altruistic nature and willingness to donate and help the community highlights his commitment to making a positive impact on the lives of those around him." *Id.*

Riva Abayeva tells a similar story, explaining that during the Covid pandemic Mr. Ilyayev "volunteered to distribute food for all staff members, doctors & nurses" at the hospital where she works. Ex. M. He also "purchased truckloads of masks, sanitizers and PPE equipment to donate to anyone who couldn't get their hands on [it] at that moment of shortage." *Id.*

Rabbi Shimon Peretz writes that Mr. Ilyayev sends monthly donations to his yeshiva in Israel and "has never expected anything in return." Ex. N. "His donations were done out of the goodness of his heart. Nerik would never ask for any recognition for his good deeds but I firmly believe that your Honor should know the character that he has." *Id.*

Diana Aminova remarks that Mr. Ilyayev "is a big advocate for the youth in the community, to be involved in our community programs/synagogues so they can be off the streets and be focused on helping." Ex. O. Bella Davydov considers Mr. Ilyayev's ability to connect with troubled teens one of his "most remarkable qualities." Ex. P. As she explains:

> He takes the time to listen attentively to their concerns, fears, and challenges without judgment, allowing these teenagers to open up and share their struggles. Through this empathetic approach, Nerik has created a safe and nurturing environment where these teenagers feel valued and understood.

*Id.* After Ms. Davydov's own son was suspended and expelled from several schools for fighting, Mr. Ilyayev was able to find him a suitable school where he has since succeeded. She credits Mr. Ilyayev with having had an "immeasurable" impact on her son's life, helping him to "make better decisions" and "empower[ing] him to overcome obstacles and create positive change in his life." *Id.* "Nerik's tireless efforts have resulted in tangible positive outcomes and have helped teenagers and my son find hope, purpose, and a brighter future." *Id.*

Mr. Ilyayev is also passionate about assisting newly arrived members of the Bukharan community to acclimate to life in the United States. Ms. Badalova's family emigrated in 1997, when she was still young. Her father had been the breadwinner in their home country but fell into a deep depression in the United States and found it difficult to provide for his children. Ex. I. Mr. Ilyayev volunteered to tutor Diana and her sister, coming several times a week to assist them with their homework. "[H]e was a source of support and encouragement during the times when I faced bullying at school due to my accent and appearance ... His unwavering commitment to helping us thrive in school and fostering our self-confidence has left an indelible impact on my life, and I will always regard him as a big brother figure." *Id.*

Several others describe the support that Mr. Ilyayev showed them as new immigrants. Mr. Ilyayev was one of the first people Nikita Shimunov met in the United States and "has been a constant source of guidance, solace, and friendship" ever since, once rushing to his aid when he got stranded after an automobile accident. Ex. Q. "He waded into the water, arranged for a tow truck, and, using his own jacket, helped me remove the water from my vehicle. He stood by my side throughout the night, ensuring I was safe and supported." *Id.*

Nerik also helped Eugene Urkin to find housing after moving to New York from Atlanta following a messy divorce. Ex. R. Later, when Mr. Urkin lost his job during the Covid pandemic, Mr. Ilyayev let him live rent free in one of his properties while he sought employment. *Id.* Mr. Urkin credits his current stability to his friend's kindness and is "eager and inspired to pay this [kindness] forward to others in every way possible." *Id.*

These are just some of the many extraordinary stories told in the letters attached. Mr. Ilyayev gives consistently and generously to his friends and neighbors without any expectation of praise or public recognition, and his charitable acts began long before the commencement of this

case. "I truly believe, writes Rabbi Kaziyev, "that such acts as these, of which there are countless examples, are reflective of who he is at heart and define him as a person." Ex. S.

Given his many kindnesses, Mr. Ilyayev's entire community was shocked to learn of his conviction. But his friends and family have remained loyal and supported him as he has endured the stress and anxiety of prosecution in this case. "As a healthcare provider," writes Mr. Ilyayev's brother Boris, "I have observed and, at times, criticized individuals who found themselves in similar situations. Now, our family finds itself in a similar position, and I am acutely aware of the judgment and criticism from some members of the community. However, it's important to remember that Nerik is more than his mistakes." Ex. T. "Our family is united in our desire to see Nerik Ilyayev rehabilitated and reintegrated successfully into society," adds Ilya. Ex. J. "We are willing to provide emotional and practical support throughout his journey toward rehabilitation." *Id.*

### III.

### MR. ILYAYEV'S OFFENSE CONDUCT

Mr. Ilyayev's offense conduct is undisputed. Between December 2020 and April 2023, he engaged in a conspiracy to commit healthcare fraud involving two pharmacies he operated and controlled. He submitted fraudulent claims to Medicare and Medicaid for HIV medications through a pharmacy in Manhattan and fraudulent claims to no-fault automobile insurance providers through a pharmacy in Queens. He also used the pharmacy in Queens to illegally sell pharmaceuticals using online marketplaces. Mr. Ilyayev operated both pharmacies using the identities of other individuals. PSR ¶ 11. The total combined loss to the victims was $6,504,069. *Id* at ¶ 55.

Mr. Ilyayev was in synagogue in April 2023 when FBI agents came to his home to arrest him, but he self-surrendered a few hours after learning about the warrant. Shortly thereafter, he informed prosecutors of his willingness to plead guilty, and he negotiated a plea agreement several months later prior to indictment and before receiving or reviewing any discovery in the case.

In his letter to the Court, Mr. Ilyayev accepts full responsibility for his wrongdoing and expresses his "deepest remorse and regret." Ex. U. "Instead of continuing to work hard and staying on the right path like I was raised to do, I tried to take a short cut. I got involved with the wrong people and made the decision to violate the law. I betrayed the trust of my loved ones and the healthcare system. The decisions I made were both stupid and short sighted." *Id.* "Every day that goes by," he adds, "I wish I could go back in time to undo what I have done." *Id.*

To demonstrate his contrition, Mr. Ilyayev has provided prosecutors with a plan for immediate, partial payment of his financial obligations, along with a detailed financial statement. As set forth in the PSR, Mr. Ilyayev owns three homes. PSR ¶ 110. His primary residence is currently occupied by his brother, Boris. He and Boris switched homes so that Mr. Ilyayev could reside with his parents and more easily provide them with support and medical care. The other two homes are rental properties. Mr. Ilyayev proposes to sell each of the properties and to turn over the proceeds to the government. Together, he expects the sales to yield more than $1 million. Should the government accept his proposal, Mr. Ilyayev and his parents plan to relocate to a rental apartment so that Boris can move back home.

Importantly, Mr. Ilyayev purchased each of the properties he intends to sell before his involvement in the fraud, and they do not constitute criminal proceeds or substitute assets. But

for Mr. Ilyayev's good faith offer to sell them as part of a settlement, they would each be beyond the government's reach.

IV.

## MR. ILYAYEV MERITS A SIGNIFICANT VARIANCE FROM THE ADVISORY GUIDELINES

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). This provision, known as the parsimony clause, applies at every federal sentencing "except as otherwise specifically provided." 18 U.S.C. § 3551(a). Indeed, the command of the parsimony clause defines this Court's "overarching duty." *Pepper v. United States*, 131 S.Ct. 1229, 1243 (2011).

Among the factors to be considered under Section 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence of criminal conduct; (C) to protect the public from future crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a).

As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper*, 131 S.Ct. at 1240 (quoting *Koon v. United* States, 518 U.S. 81, 113 (1996)). While the guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States,* 128 S.Ct. 586, 596-97 (2007). Rather, the judge is

directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id*. at 597.

Several factors warrant the Court's leniency here.

A.  Mr. Ilyayev's Extraordinary Rehabilitation

First, in the year since his arrest, Mr. Ilyayev has embarked on a course of extraordinary rehabilitation, showing both the desire and ability to live a law-abiding life. While others might have collapsed under the weight of a federal prosecution, Mr. Ilyayev has not let self-pity or anger overcome him. Instead, he has dedicated himself to redemption through repentance and good works. Margarita explains that the Jewish concept of *teshuvah* "refers to repentance, a return to God." Ex. D. She adds:

> It is a central theme to character development and personal growth. There are specific steps involved, which include: acknowledging and taking responsibility for one's actions, feeling genuine remorse and regret for one's wrongdoings, to cease all such wrongdoings, and to openly confess and sincerely commit to change and improve.  The idea is that if a person is able to commit to the process and undergo these steps, then that person is not only forgiven in the eyes of God, but it is as if that person has never committed the mistake. The person is believed to have undergone such an extreme transformation that they are no longer considered the same person as the one who sinned.

*Id.* Mr. Ilyayev has fully embraced *teshuvah*. With the assistance of the Aleph Institute, he has redoubled his charitable efforts, working with Tomchei Shabbos of Queens to deliver food to needy families; working with God's Love We Deliver (GLWD) to pack food for HIV+ individuals; and spending five hours each week at the Rego Park Senior Center where he helps seniors with their groceries and their mail. Ex. V. The Aleph Institute has submitted a report detailing Mr. Ilyayev's community service activities, which is attached as Exhibit W. Admittedly, Mr. Ilyayev began these activities with his sentencing in mind, but he has continued them over many months because of the personal fulfillment he experiences by assisting those in need. Through his efforts at GLWD,

in particular, he has told Aleph that he is "reminded of the profound impact we can have when we choose to confront our mistakes and channel our energies towards healing and compassion." *Id.*

In addition to performing community service, Mr. Ilyayev has committed to a religious studies program, including daily prayer and a weekly "Crime and Consequences" class focused on "individual remorse, introspection, and a commitment to growth and transformation." Ex. W. The rabbi with whom Mr. Ilyayev is studying writes that he has "accepted [the program] with alacrity" and "kept up with it through all these months." Ex. X. Through Aleph, Mr. Ilyayev also participates in weekly marriage counseling with Margarita. Their goal is to "learn to communicate as true partners who hold each other accountable" and to "work on rebuilding a life of integrity, honesty, and harmony." Ex. W.

Mr. Ilyayev has also embraced those aspects of *teshuvah* that relate to confession, demonstration of remorse, and resolution not to reoffend. He has been involved with a Jewish nonprofit called Emet Outreach for approximately fifteen years, since he first joined the organization as a student. Since his arrest, Mr. Ilyayev has taken the initiative to talk to small groups of Emet students, confessing his crime and explaining how he was led astray. Knowing first-hand how the temptation of "easy money" can lead even a well-intentioned person to make bad decisions, he is determined to use his mistakes as an object lesson for the young people at Emet so that they can avoid similar outcomes.

A video excerpt from one talk, given to a group of student "entrepreneurs," is attached as Exhibit Y. After an introduction by Rabbi Ari Hertz, Mr. Ilyayev details the damage his poor decisions have caused in his relationships with family, the sleepless nights and guilt that have plagued him since his arrest, the suffering he inadvertently caused to his loved ones, and his desperate hope that his own children make better choices than he did. He adds that family and

community are far more important than material wealth and that the negative consequences of unlawful activity far outweigh the financial rewards.

Mr. Ilyayev's lectures have been highly effective. According to Rabbi Hertz, the students with whom he has been speaking are deeply moved by his words. "It is important to mention," writes Rabbi Hertz, "that our students are growing up in the same community, in the same types of homes and facing the same types of pressures that Nerik did when he was taking the first steps of his journey." Ex. Z. "It's no wonder that they sat totally enraptured as Nerik spoke and asked detailed questions about every aspect of this process….[T]his is so real to them. They saw themselves in his story." *Id.* Rabbi Akiva Rutenberg, who also attended a talk, adds that Mr. Ilyayev "presented his life story in a passionate and real way," and that "[t]he students were very taken by [his] message." Ex. AA.

After one talk, the students who attended sent a series of messages to Rabbi Hertz, explaining its impact on them. Screenshots of some of those messages are attached as Exhibit BB. One student described Mr. Ilyayev's words as "the exact thing that I needed to hear" and as giving him new confidence that his choice to pursue a professional career is the right one. *Id.* Another student confessed that he "was on the cusp of performing [similar] activities" but realized after hearing Mr. Ilyayev's story that doing the right thing is more valuable than ill-gotten wealth. *Id.* A third student explained:

> He really made me think about the way I shouldn't focus on trying to become successful for my peers or family pressure. I want to make sure that I'm in a safe path and road that will lead me to having

> a successful family. [Mr. Ilyayev] did a very big mitzvah and I hope
> that he gains a lot of blessings from his repentance.

*Id.* Rabbi Hertz believes that Mr. Ilyayev's lectures are "empowering others." Ex. Z. "The integrity to own your mistakes and let others see you as imperfect in order to help them grow is unique and should not be overlooked." *Id.*

"[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *United States v. Bryson,* 229 F.3d 425, 426 (2d Cir. 2000). In sharing his story with young people, Mr. Ilyayev is not only demonstrating repentance; he is also promoting respect for the law and providing for general deterrence. His efforts "provide the most up-to-date picture of his 'history and characteristics,'" *Pepper,* 131 S.Ct. at 1242, and merit the full extent of the Court's leniency under 18 U.S.C. § 3553(a). *See, e.g., United States v. Williams,* 65 F.3d 301, 305 (2d Cir. 1995) (approving extraordinary rehabilitation as a permissible ground for departure); *see also United States v. Hawkins,* 380 F.Supp.2d 143, 165-66 (E.D.N.Y. 2005) (granting probation based on rehabilitation and stating: "what a defendant is doing while free is of great significance in determining whether that defendant has made, or is in the process of making, a success of her life. Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment") (internal citation omitted); *United States v. Rosado,* 254 F.Supp.2d 316, 321 (S.D.N.Y. 2003) (recognizing that "the successful rehabilitation of a criminal 'is a valuable achievement of the criminal process'") (citation omitted); *United States v. Blake,* 89 F.Supp.2d 328 (E.D.N.Y. 2000) (departing in bank robbery case from 87-108 months to several days in prison plus supervised release based on defendant's rehabilitation). Indeed, the court is "required, as a procedural matter, to consider evidence" of rehabilitation in deciding what sentence to impose. *United States v. Preacely,* 628 F.3d 72, 81 (2d Cir. 2010).

The Bukharan community in New York is tight knit, and its members are well-aware of Mr. Ilyayev's offense and the work he is doing to rehabilitate himself. A lenient sentence would promote respect for the law by demonstrating that the legal system is capable of distinguishing between unrepentant criminals and individuals like Mr. Ilyayev, who recognize the significance of their mistakes and engage wholeheartedly in the rehabilitative work necessary to repair the damage they have done.

B.  <u>Mr. Ilyayev Does Not Present a Risk of Recidivism</u>

Second, Mr. Ilyayev does not present a risk of recidivism. This is his first criminal conviction, he self-surrendered to authorities, and he has spent more than a year on pretrial release without a single disciplinary infraction. He has a lengthy employment history, supportive family, and reputation for kindness and decency in his community. He also accepts full responsibility for his offense and has a detailed plan for meeting his financial obligations.

In short, Mr. Ilyayev's criminal conduct is not in keeping with the otherwise responsible way he has lived his life, meaning he is highly unlikely to reoffend. *Cf. United States v. Khalid,* 09 Cr. 734 (JBW), 2011 WL 6967993, at *2 (E.D.N.Y. Dec. 13, 2011) (departing where defendant's conduct was "out-of-keeping with [his] otherwise law-abiding and responsible life"); *United States v. Cosme,* 06 Cr. 608 (JBW), 2010 WL 276599, at *2 (E.D.N.Y. Jan. 19, 2010) (finding recidivism unlikely partly given the defendant's "lack of any prior criminal history, acceptance of responsibility, …and supportive family members"); *United States v. Greene,* 249 F.Supp.2d 262, 267 (S.D.N.Y. 2003) ("it is highly unlikely that Greene will repeat his criminal conduct given that he is sixty-five years old and previously had no criminal history points").

C.  <u>Mr. Ilyayev's Family Circumstances Merit Leniency</u>

Third, Mr. Ilyayev is his parents' primary caretaker and the sole financial provider for his wife and children. His wife is pregnant, and their fourth child is due in May. Because Mr. Ilyayev intends to liquidate his real estate holdings in order to meet his financial obligations in this case, his family will be left without any rental income during his incarceration. Margarita worked as a speech therapist for the New York City schools before getting married, but any income she could earn by obtaining similar employment would be insufficient to cover the costs of childcare during the workday. Nor can she rely on family to provide childcare while she works. Mr. Ilyayev's parents are critically ill, and Margarita's mother is already the primary care provider for her own mother, Margarita's grandmother. She also babysits Margarita's brother's children during the workday.

The case has already taken a serious emotional toll on Mr. Ilyayev's children. "After Nerik's arrest," Margarita writes, "my daughters began exhibiting symptoms of anxiety. My eldest is afraid to sleep alone in her room and I often catch her staring out the window to see if the police will come again." Ex. D. Margarita has "researched extensively about the effects of incarceration on children and their development," and writes that "[e]ach search shows statistic after statistic of how these children are more likely to experience emotional distress, exhibit behavioral issues and struggle academically." *Id*. Of course, Margarita is correct. "[P]arental incarceration is now recognized as an 'adverse childhood experience' (ACE) of the type that can significantly increase the likelihood of long-term negative outcomes for children." The Annie E. Casey Foundation, *A Call to Action: Safeguarding New York's Children of Incarcerated Parents*, at 12 (May 2011); *see id*. ("[R]esearch suggests that parental imprisonment more often intensifies and compounds, rather than alleviates, the challenges children face."). "Compared to

other children, those who experience parental incarceration suffer impairments across four domains of wellbeing: behavior, education, health, and hardship and deprivation." Kristin Turney and Rebecca Goodsell, *Parental Incarceration and Children's Wellbeing, The Future of Children*, Vol. 28, No. 1, Reducing Justice System Inequality, at 148 (Spring 2018).

Mr. Ilyayev's incarceration will also affect his parents, both of whom are completely dependent upon him. As the youngest child, he has devoted his life to making sure that his parents are well cared for. Ms. Badalova puts it bluntly in writing that Mr. Ilyayev's absence "would undoubtedly have a profound impact on their health and emotional well-being." Ex. I. "The question of how long they have left," she adds, "weighs heavily on our minds." *Id.* This factor alone warrants the Court's serious consideration.

### D.  A Lengthy Sentence Will Not Promote General Deterrence

Fourth, a lengthy sentence will not promote general deterrence. The empirical research clearly shows that increases in punishment do not yield substantial deterrent effects. "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." National Institute of Justice, DOJ Office of Justice Programs, *Five Things About Deterrence* (June 2016); *see also* The Pew Charitable Trusts, *Time Served-The High Cost, Low Return of Longer Prison Terms* (June 2012)*,* at 4 ("For a substantial number of offenders, there is little or no evidence that keeping them locked up longer prevents additional crime."); Sentencing Advisory Council, *Does Imprisonment Deter? A Review of the Evidence* (Apr. 2011), at 14 ("increases in punishment levels do not routinely reduce crime through general deterrence mechanisms."). "[T]he chance of being caught is a vastly more effective deterrent than even draconian punishment." *Five Things About Deterrence.*

The advisory nature of the guidelines and discretion afforded to federal judges further undermine the strength of a general deterrence argument. This is because no individual defendant is guaranteed the same result as the one who came before. In other words, even if Mr. Ilyayev is treated leniently, the next similarly situated offender cannot expect the same treatment.

Given the difficulty in a case like this of assessing the deterrence of effect of conviction with incarceration over conviction alone, the goal of general deterrence should not outweigh the other § 3553(a) factors, including Mr. Ilyayev's rehabilitation and family circumstances, both of which counsel in favor of leniency.

## V.

## CONCLUSION

For the above reasons, we respectfully request a sentence substantially below the 40-month sentence recommended by the Probation Department.

New York, N.Y.
April 4, 2024