

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 11, 2024

**BY ECF**

The Honorable Gregory H. Woods
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Nerik Ilyayev*, 23 Cr. 506 (GHW)

Dear Judge Woods:

      The defendant in this case, Nerik Ilyayev, is scheduled to be sentenced on April 18, 2024, at 10:00 a.m., having pled guilty to conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349. The Government respectfully submits this letter in advance of the sentencing. The parties stipulated in a plea agreement to a United States Sentencing Guidelines ("Guidelines") range of 70 to 87 months' imprisonment (the "Stipulated Guidelines Range"). The parties also agreed in the plea agreement that the defendant should be sentenced consistent with the new Section 4C1.1 of the Guidelines the zero-point offender provision. Section 4C1.1 was not in effect at the time of the defendant's plea, and it provides for a two-point reduction from the Stipulated Guidelines Range. The parties further agreed in the plea agreement that a downward variance would be appropriate for the early resolution of the case, if both the defendant and his co-defendant entered guilty pleas prior to October 6, 2023. Accordingly, the parties agreed that a modified Guidelines range of 51 to 63 months' imprisonment (the "Agreed Guidelines Range") was appropriate. In the presentence report ("PSR"), the Probation Office calculates a range of 57 to 71 months' imprisonment (the "Guidelines Range"), which incorporates the adjustment for the new Section 4C1.1, but does not incorporate the additional variance to reflect the early resolution of this case. (*See* PSR ¶ 120).

      For the reasons set forth below, the Government submits that a sentence within the Agreed Guidelines Range of 51 to 63 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

A. Offense Conduct

From December 2020 until his arrest in April 2023, Nerik Ilyayev participated in a sophisticated scheme to defraud Medicare, Medicaid, and private insurance companies of millions of dollars by submitting fraudulent claims for reimbursement for medications that the defendant did not actually provide to patients. To perpetrate the scheme, the defendant operated two pharmacies. In the first phase of the scheme, the defendant purchased a pharmacy in Manhattan ("Pharmacy-1"), putting it in the name of a straw owner to conceal his own identity and evade detection. (PSR ¶ 15). Shortly after he purchased Pharmacy-1, the defendant began using it to operate a fraudulent scheme in which he orchestrated a team of delivery drivers to bring HIV patients to Pharmacy-1 to fill their prescriptions for high-priced HIV medications. (PSR ¶ 23). The defendant had his delivery drivers pay the HIV patients to fill their prescriptions at Pharmacy-1, but he did not actually provide them with the drugs they needed for their HIV. Instead, the defendant had his drivers repurchase the unopened bottles of pills back from the patients for a small fraction of the actual cost of the pills paid to the pharmacy by Medicare and Medicaid. (PSR ¶ 24). This enabled Pharmacy-1 to reap large fraudulent profits, by billing Medicare and Medicaid for distributing these medications, even though Pharmacy-1 did not have to purchase the medications because it bought the bottles back from patients and used them again and again. In the course of just around one year, from February 2021 through February 2022, the defendant submitted reimbursement requests to Medicare and Medicaid for more than $5.2 million in excess of the actual value of medications that he purchased from wholesalers. (PSR ¶ 26).

When he received the proceeds of this fraudulent scheme from Medicare and Medicaid, the defendant typically laundered the funds by moving them through a network of shell companies, ultimately to be transferred overseas to Uzbekistan. (PSR ¶¶ 28-29). The defendant would provide checks from Pharmacy-1 to co-conspirators, who would deposit the checks into various shell companies and wire the money overseas. (PSR ¶ 30). The investigation revealed that the defendant laundered at least approximately $4.2 million in criminal proceeds through this method. (PSR ¶ 34).

In February 2022, an FBI source received some of the Pharmacy-1 checks and provided them to the FBI rather than sending the funds overseas. (PSR ¶ 33). In response, one of the defendant's co-conspirators confronted an individual who he believed was holding the Pharmacy-1 checks and attacked that individual with a baseball bat. (PSR ¶ 33). That co-conspirator was arrested in February 2022 and charged with Hobbs Act extortion, and was later convicted.

Shortly after his co-conspirator was arrested in connection with attempting to launder criminal proceeds from Pharmacy-1, the defendant stopped operating Pharmacy-1. (PSR ¶ 46). However, the defendant continued to operate another pharmacy ("Pharmacy-2"), which was located in Queens and which the defendant had acquired in November 2021. (PSR ¶¶ 11, 46). As with Pharmacy-1, the defendant purchased Pharmacy-2 using a straw purchaser in an attempt to evade detection. (PSR ¶ 47). The defendant fraudulently used the straw purchaser's identity to open various bank accounts in furtherance of his fraudulent overbilling scheme. (PSR ¶ 47).

Pharmacy-2 does not appear to have had any legitimate operations. Rather, the defendant used Pharmacy-2 solely as a vehicle to submit fraudulent claims to no-fault automobile insurance companies. (PSR ¶ 48). The defendant had drivers who recruited people to falsely report that they had been in car accidents. Pharmacy-2 then billed the insurance companies for medications that these people supposedly needed for injuries arising from the non-existent accidents. (PSR ¶ 49). This scheme enabled the defendant to obtain approximately $1.2 million in proceeds from fraudulent insurance claims. (PSR ¶ 50). And the defendant obtained an additional $900,000 in criminal proceeds from using Pharmacy-2 to sell HIV medications that he had obtained from illegitimate sources. (PSR ¶ 51).

The defendant engaged in extensive efforts to escape detection for his participation in this fraudulent scheme. As noted, the defendant purchased Pharmacy-1 and Pharmacy-2 in the name of two separate straw purchasers, and he opened bank accounts using those other people's identities as well. In addition, he stopped operating Pharmacy-1 after one of his co-conspirators had been arrested while attempting to launder proceeds from Pharmacy-1. The defendant also conducted most of his business using a cellphone that he kept locked up in a vacant office, so that it could not be traced to his residence. (PSR ¶ 19).

### B. Procedural History

Ilyayev was arrested pursuant to a criminal complaint on April 13, 2023. On October 3, 2023, the defendant consented to the filing of the Information in this case and entered a plea of guilty, pursuant to a plea agreement, to conspiracy to commit health care fraud. The plea agreement had a stipulated guidelines range of 70 to 87 months' imprisonment, but the parties agreed that the appropriate range would be 51 to 63 months' imprisonment due to the expectation that the Guidelines would be amended to provide an additional reduction and due to the early resolution of the case. On December 22, 2023, the United States Probation Office issued the presentence report in this case, which calculates a guidelines range of 57 to 71 months and recommends a term of 40 months' imprisonment. PSR at 41. On April 4, 2024, the defendant filed a sentencing submission arguing for a sentence substantially below the 40-month sentence recommended in the PSR.

### C. Discussion

The most important sentencing factors in this case are the need to reflect the seriousness of the defendant's offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to this defendant and other similarly situated individuals. *See* 18 U.S.C. § 3553(a)(2)(A)-(C). All of these considerations weigh in favor of a sentence within the Agreed Guidelines Range of 51 to 63 months' imprisonment.

The defendant played a significant role in a large and sophisticated health care fraud scheme. He submitted over $5.2 million in fraudulent claims to Medicare and Medicaid, and an additional more than $1.2 million in fraudulent claims to insurance companies. To successfully perpetrate this scheme, the defendant engaged in a range of other fraudulent and criminal behavior.

He purchased pharmacies in the names of straw purchasers, and fraudulently registered the pharmacies in those other people's names. He also made false representations to financial institutions again and again, including opening bank accounts and executing transactions in criminal proceeds using the names of other people.

The seriousness of the defendant's crime is further aggravated by a number of factors. ***First***, the defendant participated in the scheme for more than two years, and engaged in highly sophisticated means to conceal his identity and evade detection. As described at length in the PSR, apprehension of the defendant required an unusually exhaustive law enforcement investigation, which generally warrants a higher sentence. *See Harmelin v. Michigan*, 501 U.S. 957, 989 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties."). ***Second***, the defendant persisted in his illegal scheme even after a co-conspirator had been arrested after savagely beating another person. Rather than desist in his criminal conduct, the defendant merely shifted his conduct to a new pharmacy, and continued to reap his ill-gotten gains. ***Third***, the defendant's fraud caused health risks to vulnerable people. In paying cash to needy HIV patients to buy back their medications, he exposed them to potential serious health consequences from failure to use their prescribed medications. He compounded that harm by distributing illegitimately obtained HIV medications to other pharmacies, undermining the systems that are meant to protect the safety and security of prescription medication distribution. These factors are not wholly accounted for in the Guidelines range in this case, and they counsel in favor of a substantial term of incarceration.

In his sentencing submission, the defendant attempts to paint his offense as a "digression" from an otherwise law-abiding life, as if the scheme was a momentary lapse in judgment. The facts put the lie to that claim. As noted, the defendant persisted in this scheme for years, including even after a co-conspirator's arrest. He also engaged in a wide variety of additional criminal conduct in furtherance of the health care fraud, from identity theft to bank fraud to money laundering. If anything, the defendant's dismissive reference to his crime as merely a "get-rich-quick" scheme underscores that he is minimizing the seriousness of his criminal conduct and that he poses a risk of committing similar crimes in the future if he does not face serious consequences.

The defendant argues generally that he should receive a below-guidelines sentence due to his background and character, as well as his family situation. He argues that it would cause hardship if he was sentenced to a lengthy term of imprisonment. While it is no doubt true that the defendant's family would be impacted by his incarceration, that is sadly the case for nearly all families with incarcerated loved ones. Perhaps for this reason, the Second Circuit has held that a defendant's "family ties . . . generally only justify a downward departure in 'unusual' or 'extraordinary' cases[.]" *United States v. Lyttle*, 460 F. App'x 3, 10 (2d Cir. 2012); *see also* U.S.S.G. § 5H1.6 ("In sentencing a defendant . . . family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."). While the defendant appears to have close family ties, he does not point to anything so extraordinary as to justify the level of variance he seeks.

The defendant also submits a number of letters from various supporters. It is, of course, appropriate for the Court to take the defendant's background and these letters into account to some

degree. However, the defendant does not cite anything so extraordinary in his background or character that it would warrant a substantial variance from the sentence recommended by the Sentencing Guidelines and by the Probation Office. *See, e.g., United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (noting that personal factors should ordinarily only support a downward departure in "extraordinary cases" where multiple factors "combine to create a situation that differs significantly from the heartland cases covered by the guidelines"). While the Government does not dispute that the defendant has helped others in the course of his life, these characteristics are not out of the ordinary for a white collar criminal and do not outweigh the other sentencing factors that weigh in favor of a substantial sentence of incarceration. *See United States v. Regensberg*, 635 F.Supp.2d 306, 308-10 (S.D.N.Y. 2009) (noting that an array of letters from the community "falls into a pattern advanced by a subset of the white collar criminal," and noting that in many cases it is a defendant's very reputation in the community that can facilitate his ability to commit this type of fraud); *United States v. Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)). To deter the defendant and other similarly situated defendants from future crimes, and to respond to the seriousness of his crime with an appropriate punishment, a sentence within the Agreed Guidelines Range is warranted.

The defendant's submission also suggests that he is somehow going to "meet his financial obligations in this case" by reaching an agreement with the Government to resolve the forfeiture judgment. That mischaracterizes the record entirely. The defendant's crime resulted in a loss of over $6.5 million, and the defendant does not appear to have identifiable assets in this country that are even close to sufficient to recover that loss for the victims. This is likely due in large part to the fact that the defendant laundered large amounts of criminal proceeds by moving them overseas, where he can potentially make use of them in the future while keeping them out of the Government's reach. In order to obtain some measure of partial recovery, the Government has engaged in some discussions with the defense about an agreement in which the Government would accept a payment from the defendant on a date certain in satisfaction of the forfeiture to be awarded in this case. But such an agreement would not be a favor to the Government, as the defendant attempts to depict it in his sentencing submission. On the contrary, if the parties reach such an agreement, the defendant would get the substantial benefit of having the ability to satisfy his forfeiture judgment with a payment of less than the full amount. Moreover, the defendant's suggestion that absent such an agreement, the properties he owns in this country could not be forfeited is incorrect. Those properties would in any event be substitute assets that the Government could pursue upon the entry of an order of forfeiture in this case.

In short, far from "meeting his financial obligations," the defendant will likely have reaped substantial financial benefits from his crimes. Because the defendant transferred funds abroad outside the regulated financial system, there is no way to know just how much of his crime proceeds the defendant squirreled away in Uzbekistan, and there is no way for the Government to forfeit those funds or recover them for victims. Upon completion of his sentence, the defendant may well be able to use those funds, either by returning to Uzbekistan or by moving the money back into the United States through the same illicit means by which he moved it out. The risk that the defendant may still stand to benefit financially from his crimes counsels in favor of a substantial

prison sentence, within the Agreed Guidelines Range of 51 to 63 months, to send a message to the defendant and others who may be considering engaging in similar conduct that these crimes carry a meaningful consequence.

      Very truly yours,

      DAMIAN WILLIAMS
      United States Attorney

by: _____
      Thane Rehn
      Assistant United States Attorney
      (212) 637-2354